[Cite as *State v. Short*, 2026-Ohio-3063.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
PAULDING COUNTY


STATE OF OHIO,

    PLAINTIFF-APPELLEE,

v.

SHELBY LEE BLAKE SHORT,

    DEFENDANT-APPELLANT.

CASE NO. 11-25-12


OPINION AND
JUDGMENT ENTRY


Appeal from Paulding County Municipal Court
Trial Court No. CRB2500113

Judgment Affirmed

Date of Decision: August 10, 2026


APPEARANCES:

    *Brian A. Smith* for Appellant

**WALDICK, J.**

{¶1} Defendant-appellant, Shelby Short ("Short"), brings this appeal from the October 1, 2025 judgment of the Paulding County Municipal Court. For the reasons that follow, we affirm.

*Background*

{¶2} Short was charged in the Paulding County Municipal Court with Violating a Protection Order in violation of R.C. 2919.27(A)(2), a first degree misdemeanor. It was alleged that he continued to contact a former girlfriend despite a protection order being in place. Short pled not guilty to the charge.

{¶3} Prior to trial, Short, proceeding pro se, filed a pleading with the court demanding a speedy trial, a jury trial, and demanding that his accuser be present at trial.[1] Short ultimately proceeded to a jury trial on August 26, 2025.

{¶4} At trial, the State presented evidence that Short had been in a relationship for approximately six months with a woman named L.H. Eventually, L.H. ended the relationship and told Short not to contact her. Nevertheless, Short continued to contact L.H., so she sought and received a protection order. Short was present for the full hearing on the protection order, and was aware of its contents.

---

[1] The pleading also stated: "I also plea with the Court to get right with God. My God will Judge you. When you are in service to his people it is your duty to be right with him. You don't get to argue with him on Judgment Day. You are out of your mind if you think that day is not coming for everyone. *Christo Rey*!"

{¶5} Despite the protection order being in place, Short continued to contact L.H., including contacting her family members. After receiving some concerning messages from Short on June 9, 2025, L.H. went to the police with the messages and Short was ultimately charged with the instant offense. The jury found Short guilty as charged.

{¶6} On October 1, 2025, Short was sentenced to serve 180 days in jail, with 135 of those days suspended. Short was also placed on community control for two years, ordered to pay a fine and court costs, and ordered to complete 20 hours of community service. A judgment entry memorializing his sentence was filed that same day. It is from this judgment that Short appeals, asserting the following assignments of error for our review.

### First Assignment of Error

**Because the trial court did not make a sufficient inquiry into Appellant's waiver of counsel, Appellant's waiver of counsel was not knowingly, voluntarily, or intelligently made, and the trial court erred in granting Appellant's request to represent himself at trial, in violation of Appellant's right to counsel under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.**

### Second Assignment of Error

**Because the jury lost its way and created a manifest miscarriage of justice in convicting Appellant, Appellant's conviction for Violating a Protection Order was against the manifest weight of the evidence.**

**Third Assignment of Error**

**Because the trial court acted in [an] arbitrary, unconscionable, and unreasonable manner in sentencing Appellant, the trial court's sentence of Appellant constituted an abuse of discretion.**

*First Assignment of Error*

{¶7} In his first assignment of error, Short argues that his waiver of counsel was not made knowingly, voluntarily, and intelligently.

Relevant Authority

{¶8} The Sixth Amendment right to counsel extends to misdemeanor cases that can result in the imposition of a jail sentence. *State v. Wilson*, 2018-Ohio-2805, ¶ 5 (3d Dist.). However, a criminal defendant has "an independent constitutional right of self-representation and . . . may proceed to defend himself without counsel when he voluntarily, and knowingly and intelligently elects to do so." *State v. Gibson*, 45 Ohio St.2d 366 (1976). These Sixth Amendment rights are embodied in Crim.R. 44, which reads, in pertinent part, as follows:

> (B) Counsel in petty offenses. Where a defendant charged with a petty offense is unable to obtain counsel, the court may assign counsel to represent the defendant. When a defendant charged with a petty offense is unable to obtain counsel, no sentence of confinement may be imposed upon the defendant, unless after being fully advised by the court, the defendant knowingly, intelligently, and voluntarily waives assignment of counsel.

> (C) Waiver of counsel. Waiver of counsel shall be in open court and the advice and waiver shall be recorded as provided in Rule 22. In addition, in serious offense cases the waiver shall be in writing.

**{¶9}** Criminal Rule 44 makes it clear that the waiver of the right to counsel "cannot be presumed from a silent record." *State v. Miyamoto*, 2006-Ohio-1776, ¶ 14 (3d Dist.). "In order to establish an effective waiver of right to counsel, the trial court must make sufficient inquiry to determine whether the defendant fully understands and intelligently relinquishes that right." *Gibson* at paragraph two of the syllabus. Importantly, however, in "petty offense" cases, like the case *sub judice*, the waiver of counsel does not need to be in writing. *See* Crim.R. 2(C), (D); *State v. Boatwright*, 2020-Ohio-5068, ¶ 12 (7th Dist.)

**{¶10}** Before a defendant can waive the right to counsel, the trial court must be satisfied that the defendant made an intelligent and voluntary waiver of the right knowing that he will have to represent himself. *Id*. at ¶ 10. Further, the court should inform the defendant of the dangers inherent in self-representation.

**{¶11}** Finally, we note that the State generally bears the burden of overcoming presumptions against a valid waiver. *Wilson*, *supra*, at ¶ 6. We conduct a de novo review of whether a defendant knowingly, voluntarily, and intelligently waived his right to counsel. *State v. Beightler*, 2019-Ohio-4522, ¶ 23 (3d Dist.).

Analysis

**{¶12}** In order to address whether Short made a knowing, voluntary, and intelligent waiver of his right to counsel, we must review the dialogue between Short

and the trial court that occurred prior to trial. On the morning of trial, prior to voir

dire, the trial court addressed Short, and the following exchange occurred.

THE COURT: . . . And, Mr. Short, you're representing yourself; is that correct?

MR. SHORT: Yes.

THE COURT: All right. So several things we're going to cover before we start to bring the jury in for selection.

The charge against you, Mr. Short, is violating a protection order.

[The court discusses the charge and potential penalties with Short at length.]

. . .

Okay. There are many technical problems that you may encounter today. You are held to the same standard as any attorney licensed to practice law in the State of Ohio.

You must follow the rules of court and the Rules of Criminal Procedure.

There are many risks involved in self-representation. It is never recommended due to the many technical problems and complex rules to be followed in a jury trial that you represent yourself.

Again, you are held to the same standard as any lawyer who might appear in a similar manner representing a client. You must become familiar with the Rules of Evidence, Rules of Criminal Procedure, and the local rules. The court expects you to known and to follow those rules.

Further, the court will not advised you about these matters and you are expected to know and follow those rules without guidance from the court.

You must conduct yourself in a professional and respectful manner to the court, to the State, and to all the witnesses at all times in this case. You are advised if you do not conduct yourself in such a manner, the court may revoke your right to self-representation or may take further action as may be necessary.

Have you familiarized yourself with the Rules of Evidence, Rules of Criminal Procedure, and local rules?

MR. SHORT: Slightly.

THE COURT: Slightly.

MR. SHORT: To the – to the best of my ability (inaudibles).

THE COURT: Okay. Do you still wish to continue representing yourself with the information I've just provided to you?

MR. SHORT: Yeah. It's still the best route, yes.

THE COURT: Okay. I also want to explain to you (inaudibles) in this voir dire, the questioning of prospective jurors by a judge, the attorneys, and in this case, by the defendant.

[Voir dire process explained including challenges for cause and preemptory challenges]

. . .

Again, Mr. Short, I'm asking you, do you wish to consider representing yourself knowing these other factors that are involved?

MR. SHORT: It's most definitely the best route at this time.

. . .

THE COURT: I also want to discuss protocol in the court. [The court provides instructions regarding objections and interactions with jurors].

I'm going to ask you again. Do you still want to go forward today representing yourself?

MR. SHORT: Yeah.

THE COURT: Okay.

MR. SHORT: God's word is still with me.

THE COURT: So, finally, you do have the right to testify on your own behalf if you wish. If you testify, you may do so in a story fashion. You don't have to ask yourself a question and answer the question.

But understand that the prosecutor may then cross examine you. It's a risky proposition for any criminal defendant to testify on their own behalf. It is riskier without an attorney to guide you through relevant questions. Cross examination opens up much information that you may not wish the jury to hear.

Are you going forward with self-representation, sir?

MR. SHORT: Yes. You will not be able to persuade me otherwise.

THE COURT: Okay. Thank you.

All right. The court's made a full inquiry of the defendant. The court has answered questions that the defendant may have and considered their responses.

I am finding that the court – that the defendant has knowingly, intelligently, confidently, and voluntarily waived his right to counsel and the court will permit you to represent yourself in this matter today.

(Tr. at 5-17).

{¶13} Short argues on appeal that the preceding dialogue was insufficient to determine that his waiver of counsel was made knowingly, voluntarily, and intelligently. Generally, for a waiver of counsel to be valid, the waiver "must be

made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter." *State v. Taylor*, 2013-Ohio-1300, ¶ 13 (3d Dist.). In addition, the defendant should be made aware of the dangers and disadvantages of self-representation. *Id.*

{¶14} After reviewing the trial court's dialogue with Short, the trial court ensured Short was aware of the charge and possible penalties, directly discussing those issues with Short. In addition, the trial court discussed a potential defense with Short. The trial court also *repeatedly* discussed the potential problems with self-representation with Short, and yet Short responded *unequivocally* that he could not be persuaded to proceed otherwise. The trial court thus directly complied with the requirements of *e.g. Taylor*, *supra*, in determining that Short's waiver was knowing, intelligent, and voluntary.

{¶15} Still, Short claims that there were deficiencies in the dialogue. For example, he argues that the trial court did not advise him of his right *not* to testify. However, the trial court directly discussed with Short his right to testify if he "wish[ed]" and the trial court discussed reasons why a defendant might not want to testify.

{¶16} Under these facts and circumstances, after a full review of the trial court's dialogue with Short, we do not find that the trial court erred by determining

that Short's waiver of counsel was knowing, voluntary, and intelligent. Therefore, Short's first assignment of error is overruled.

## Second Assignment of Error

{¶17} In his second assignment of error, Short argues that his conviction was against the manifest weight of the evidence.

## Standard of Review

{¶18} In determining whether a conviction is against the manifest weight of the evidence, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder clearly lost its way and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). When applying the manifest weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 2012-Ohio-5233, ¶ 9 (3d Dist.), quoting *State v. Hunter*, 2011-Ohio-6524, ¶ 119.

## Controlling Statute

{¶19} Short was convicted of Violating a Protection order in violation of R.C. 2919.27(A)(2), which reads:

(A) No person shall recklessly violate the terms of any of the following:

. . .

(2) A protection order issued pursuant to section 2151.34, 2903.213, or 2903.214 of the Revised Code[.]

Analysis

{¶20} L.H. met Short through a Christian-Catholic dating app in September of 2023. As L.H. and Short lived an hour apart, they mostly conversed on the phone or through text messages until they met in person in November of 2023.

{¶21} L.H. testified that she took some day trips with Short and that Short met L.H.'s brother and sister. L.H. testified that the relationship lasted about six months. L.H. testified that she ended the relationship through text message after there were recurring issues. L.H. testified that she continued to have contact with Short for a brief period after the relationship ended, but when Short began arguing with her about the breakup she became frustrated.

{¶22} L.H. testified that on June 9, 2024, she affirmatively indicated to Short that she was done with him and that she would have no more contact with him. She indicated she did not want any contact whatsoever with Short. Nevertheless, Short continued to contact L.H. even though she would not respond to him.

{¶23} At one point, Short acquired L.H.'s parents' phone number and Short contacted L.H.'s parents even though they had never met. Short actually asked

L.H.'s father to "put in a good word for him." Short also sent packages to the address of L.H.'s parents and to L.H.

{¶24} Although L.H. was not sending messages back to Short, he continued to send her messages, and at one point he sent her a message stating that he was "going to [L.H.'s] mom," with no indication of what that meant, worrying L.H. In addition, Short attempted to contact L.H. through other applications such as Pinterest and Facebook.

{¶25} In November of 2024, L.H. contacted the Antwerp Police Department because Short was continuing to contact her. The Antwerp Police Department contacted Short and told him to stop contacting L.H. However, in January of 2025, L.H. saw Short's truck near L.H.'s church. Short lived approximately 90 minutes from the church according to L.H., and Short was not a member of that church. Short had not attended the church with L.H. at any point.

{¶26} After the incident of Short showing up at L.H.'s church, L.H. sought a protection order in the Paulding County Common Pleas Court. She was granted an initial ex parte order, then after full hearing was held wherein Short was present, the protection order was granted. The protection order was issued February 7, 2025 and was effective until February 6, 2028. The protection order contained numerous provisions, including the following:

> [Checked box] 7. RESPONDENT SHALL NOT INITIATE OR
> HAVE ANY CONTACT with the protected persons named in this

Order or their residences, businesses, places of employment, schools, day care centers, or child care providers. Contact includes, but is not limited to, landline, cordless, cellular or digital telephone; text; instant messaging; fax; e-mail; voicemail; delivery service; social media; blogging; writings; electronic communications; posting a message; or communications by any other means directly or through another person.

(Ex. A).

{¶27} Despite the protection order being in place, and despite Short being aware of the order, he contacted L.H. multiple times on June 9, 2025, exactly one year after the last time L.H. had messaged Short.  Short sent L.H. the following message:

[L.H.] it's the day after Pentecost. You don't have to pretend to be scared of me. If you really were then remember the earthquake. I belong to Christ. The only threat I am is to Satan. I'm confused God doesn't tell me everything esp like the house situation. I don't want to miss it if you need some reassurance before the day is over or if you are really done. You changed the one pic I told you about with the other one I mentioned to with the paths. I love you [L.H.]. It's okay if you don't feel the same. Can you just let me know today without police involvement but if you want I can go to jail for this text. I have to start moving on tomorrow if you don't love me by now. Can you just give me a courtesy call or text to let me know gently.

(Ex. D).

{¶28} A couple of hours later, Short added another message that stated "Can you at least change photo to spare me 4 more hours of pain?" (*Id*.)

{¶29} Although L.H. had "blocked" Short's number, she could still see the messages he was sending her. But when L.H. did not respond to Short's messages,

-13-

another unknown phone number sent messages to L.H. stating the same things Short had sent her in the other messages. However, the second message contained some additional language that L.H. found disturbing.

> Can you at least change fb photo to save me 4 more hours of pain and maybe coming to your house and you maybe shooting me (an innocent man that only loved to[o] much and held onto signs that idk why you left up if you don't love me) I'm a protector and provider no matter what you say. What is the revenge for.[2] Souls in purgatory have already benefit [sic]

(Ex. F). L.H. was scared by the mention of "shooting" in the message so she contacted the Antwerp police again.

{¶30} Short was charged with violating the terms of the protection order for the messages he sent to L.H. on June 9, 2025. Importantly, while his case was pending, Short filed multiple letters/pleadings in the protection order case. The first letter reads as follows:

> I plea with the court to urgently hear my prayers in dismissing my case allowing the restrictions of my firearms to be reinstated. I affirm everything I'm saying is true. Some of it may do me no favors unless you know my overall objective, that is to help as many as possible to avoid the loss of heaven & time is of the essence. Matthew 7:22-23 exemplifies how many lukewarm and non-believers will not see heaven. I would also like to remind the court that Gods ways are not mans way. What may seem awkward to us may not be to him. [L.H.] and I did have a conversation about her planning to leave the

---

[2] Based on Short's statements at the trial, it appears that Short was viewing L.H.'s profile picture on Facebook, and the profile picture was of some area in nature where Short and L.H. had visited together. Short believed that L.H. was sending him a "sign" or "message" by using a photograph that was taken during a time they were together. L.H. testified that she changed the profile picture to one of nature rather than a picture with her in it because she did not want Short to be able to see her photograph on Facebook.

relationship. God asked me to ask her I hadn't seen it coming and was surprised to learn. He gave me options on ways to save the relationship. It did accumulate to the waiting of a year which is up. The very last day would be a year from the last day she texted back, June 9. (getting the court involved while necessary was also parts [sic] of Gods plan to help a court official. The irreversible hasn't been done so that is good. I did tell [L.H.] about other signs so that she knew I was honest. The 3.0 earthquake 3 days before the Solemnity of Mary a mile south of Hicksville and about the delay of the Saint Judge Relic were two things even I had trouble believing happened.

I held on to signs of what I believe [L.H.] kept up on purpose to show that there was still hope for us to work. Things we discussed privately. I believe my over zelous [sic] pursuit of God and some of my mentionings may seem frightening for [unreadable]. I think the court can observe I have behaved and followed the orders and not contacted nor went [to] a place she is at. I can't deny that time is running out and I accept if she doesn't want to be with [unreadable] I wish no one ill will and even pray my enemies make it to heaven.

This pain has pierced deeper than anything but I'm smart enough to know they [unreadable] to be in it with me. I ask that the court dismiss to give her a chance to legally reach out before the 9th. This would increase the chance of me being able to keep my badge to work in nuclear facilities. I haven't seen if it was revoked yet. At the very least lift the restrictions of my firearms so I can teach my nephews to hunt or protect my family. Bad guys don't care about laws and order. I'm not a bad guy. My faith increases my reason and knowledge. It's of sound mind and doctrine.

Love and Respect
Shelby Blake Short

(Ex. B).

{¶31} In Short's second letter to the trial court, he actually admitted that he violated the protection order. The second letter reads as follows:

> I plea and pray (ask) again that my case be dismissed on special circumstances. I did violate the order yesterday. [L.H.] doesn't have to worry about me anymore. We could of helped more people together, yet at the very least I'm hoping she's honest with you guys to at least help some of Paulding. If you absolutely have to charge me I am okay with it. Jesus already knows I'd die a martyr let alone do a little jail time. There's still little chance we could work, however there is nothing more I can do. My guns are the least of my concern in this when I have God & genuinely want others closer to him as well. There being nothing else I can do to help us work gives me no reason to contact her anymore. If I were to come around or contact again without her reaching out, I could understand harsh punishment in the future. With what [L.H.] already knows of what we spoke of there's no good reason for me to be punished now. Please let me move forward even if [L.H.] decides to be honest or not.
> Love & Respect of Christ, Shelby Short.

(Ex. C).

**{¶32}** In addition to the testimony of L.H. and a member of the Antwerp Police Department at trial, copies of the text messages and letters were introduced into evidence at trial.

**{¶33}** Short testified on his own behalf at trial that he believed "special circumstances" existed for him such that he was not violating the protection order. Short believed that he had received prophecies from God, including predicting an earthquake in northwest Ohio, and that the prophecies essentially indicated to him that on June 9, 2025, one year from the last time L.H. had made contact with him, L.H. would understand Short's honesty. Short now argues on appeal that that the "special circumstances" establish that he did not "recklessly" violate the terms of

the protection order, thus he contends his conviction was not supported by the weight of the evidence.

{¶34} Contrary to Short's argument, the evidence in this case is simple and straightforward. Short and L.H. were in some type of relationship. L.H. ended the relationship and told Short not to contact her, yet he continued to do so. L.H. sought and received a protection order. Short was aware of the order, but he contacted L.H. anyway and he even admitted that fact in his letter to the court.

{¶35} While Short may feel this case contains "special circumstances," Revised Code 2919.27(A)(2) does not provide a legal defense for a defendant to violate a protection order because he (perhaps genuinely) believes God has allowed him to do so. The evidence clearly and affirmatively establishes that a protection order was in place, and that Short violated that order. Therefore, this is not one of the exceptional cases where the evidence weighs heavily against the conviction. For all of these reasons, Short's second assignment of error is overruled.

*Third Assignment of Error*

{¶36} In his third assignment of error, Short argues that the trial court abused its discretion in sentencing him to 180 days in jail, with 135 days suspended. Short was also placed on community control for 2 years, ordered to pay a fine and court costs, and he was ordered to complete 20 hours of community service.

Standard of Review

**{¶37}** We review a trial court's sentence on a misdemeanor violation under an abuse-of-discretion standard. *State v. Gingerich*, 2025-Ohio-4908, ¶ 7 (3d Dist.). An abuse of discretion suggests that a decision is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157-158 (1980).

Analysis

**{¶38}** A trial court is required to consider the sentencing principles of R.C. 2929.21 and the criteria of R.C. 2929.22 before imposing a misdemeanor sentence. *Gingerich* at ¶ 8. Specifically, when imposing a sentence for a misdemeanor offense, R.C. 2929.21(A) states that a trial court "shall be guided by the overriding purposes" of "protect[ing] the public from future crime by the offender and others" and "punish[ing] the offender."

> This requires the trial court to
>
> consider the impact of the offense upon the victim and the need for changing the offender's behavior, rehabilitating the offender, and making restitution to the victim of the offense, the public, or the victim and the public.

R.C. 2929.21(A). Further, R.C. 2929.21(B) states that the

> sentence imposed for a misdemeanor . . . shall be reasonably calculated to achieve the two overriding purposes of misdemeanor sentencing . . . commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentences imposed for similar offenses committed by similar offenders.

{¶39} In turn, R.C. 2929.22(B)(1) contains a list of factors the trial court is to consider in determining the appropriate sentence for a misdemeanor.

> Stated generally, those factors include the nature and circumstances of the offense(s); whether the offender has a history of persistent criminal activity and is likely to commit another offense; whether there is a substantial risk that the offender will be a danger to others; whether the victim's circumstances made the victim particularly vulnerable to the offense or made the impact of the offense more serious; and factors relating to the offender's military service, if any.

*State v. Johnson*, 2022-Ohio-1782, ¶ 11 (2d Dist.).

{¶40} "In following the provisions of R.C. 2929.22, a trial court is not required to state its specific reasons for imposing a sentence for a misdemeanor conviction." *State v. Wilson*, 2018-Ohio-2805, ¶ 13 (3d Dist.). Instead, "this court will presume the trial court considered the criteria set forth in R.C. 2929.22 when: the sentence at issue is within the statutory limits; and there is no affirmative showing that the trial court failed to consider the applicable statutory factors." *State v. Urban*, 2007-Ohio-4237, ¶ 13 (3d Dist.).

{¶41} In this case, Short argues that he had no prior convictions, that there was no evidence that there was a substantial risk that he would be a danger to others, and that he was gainfully employed. He argues that these factors should have weighed more heavily in his favor, thus the trial court abused its discretion.

{¶42} Notably, at the sentencing hearing, the State actually recommended that Short receive 90 days in jail because Short repeatedly would not take responsibility for his actions, believing his violation of the protection order to be justified. Contrary to the State's recommendation, the trial court only required Short to serve a 45-day jail term *and* the trial court allowed Short to choose his reporting date.

{¶43} Short is correct that he did not have any prior convictions, but it appears the trial court took that into account by not ordering Short to serve the maximum possible jail-term, or even half of the maximum possible jail-term. While the court initially imposed a 180-day jail term, 135 of those days were suspended, so Short would only serve one-quarter of the maximum possible penalty based on his actions in this case.

{¶44} In addition, although Short argues on appeal that he was no danger to others, his decisions to keep contacting L.H. despite the protection order being in place directly challenges that claim. In fact, at the sentencing hearing, after a statement from L.H. was read by a victim's advocate indicating L.H. wanted nothing to do with Short, he still felt like she had "lead [him] on" despite the fact that she blocked him and did not correspond with him at all after June 9, 2024. L.H.'s statement at the sentencing also clearly indicated that Short's actions had altered L.H.'s life to a significant degree in a negative manner.

**{¶45}** Based on the record before us, we do not see anything arbitrary, unreasonable, or unconscionable in the trial court's sentence of Short. The sentence is compliant with the applicable statutes and there is no indication that the trial court failed to consider the appropriate statutes in fashioning the sentence. Therefore, Short's third assignment of error is overruled.

*Conclusion*

**{¶46}** Having found no error prejudicial to Short in the particulars assigned and argued, his assignments of error are overruled and the judgment of the Paulding County Municipal Court is affirmed.

***Judgment Affirmed***

**MILLER, and WILLAMOWSKI, J. J., concur.**

Case No. 11-25-12

# **JUDGMENT ENTRY**

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered.  The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket.  See App.R. 30.


                                                                             _____
                                                                             Juergen A. Waldick, Judge


                                                                             _____
                                                                             Mark C. Miller, Judge


                                                                             _____
                                                                             John R. Willamowski, Judge

DATED:
/jlm